

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

FTB:RWN
F. #2024R00755

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

March 9, 2026

<u>By ECF and Email</u>

Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. Daryl Campbell
<u>Criminal Docket No. 25-108 (NGG)</u>

Dear Judge Garaufis:

The government respectfully submits this letter in advance of the defendant Daryl Campbell's sentencing, which is currently scheduled for March 23, 2026.  On September 12, 2025, the defendant pled guilty to one count of conspiracy to possess contraband in prison, in violation of 18 U.S.C. § 371.  For the following reasons, the government respectfully submits that a sentence of 33 months' imprisonment, consecutive to the sentence the defendant is already serving, is warranted in this case.

I.     <u>Factual Background</u>

In the summer of 2024, the defendant was detained at the Metropolitan Detention Center in Brooklyn (the "MDC") on pending firearms charges in the Southern District of New York.  <u>See</u> <u>United States v. Daryl Campbell</u>, 17-CR-112 (LGS) (S.D.N.Y.).  While incarcerated, the defendant orchestrated the smuggling and sale of contraband at the MDC, including an attempt to smuggle a rope containing a scalpel, a cell-phone charging cord and plug, two lighters, cigarettes, and the federally controlled substances MDMB-4en-PINACA, marijuana, and buprenorphine through a window at the MDC.

On June 25, 2024, correctional officers seized a contraband cell phone (the "Contraband Phone") from a locker assigned to the defendant.  <u>See</u> ECF No. 1 at 3.  An extraction of data from the Contraband Phone revealed that it was used to access the defendant's Twitter/X account "@TAXSTONE," contained the minutes of a cooperating witness's testimony from the defendant's manslaughter trial, and was used to make numerous voice recordings through which the defendant organized the purchase and sale of contraband while detained at the MDC.  <u>Id.</u> at 3-5.  For example, the Contraband Phone contained voice recordings, the contents of some of which are detailed below:

a.  <u>Recordings dated April 20-22, 2024</u> – "I got O's for eighteen. . . . And I got grabba[1] too. . . . Fingers of grabba, $300.  Fuck you talking about, pussy?"

b.  <u>Recording dated April 22, 2024</u> – "Yo, her shit is still frozen, so what I'ma do is, I'ma just make one of these [N-word]s I sell some of this bud[2] to send shit directly to you.  Or if this [N-word] is in the Bronx, I'll just have this [N-word] give it to you in cash."

c.  <u>Recording dated April 24, 2024</u> – "Yo, see how much a pound of grabba is too."

d.  <u>Recording dated April 27, 2024</u> – "Yo, whatever plates you got right now, just give me a plate and I'll give you the bread back in like a day or two.  Cause I'm gonna get that shit in tomorrow.  But try and get it to me early tomorrow, like before, before 2 o'clock."

<u>See</u> ECF No. 1 at 5.  The Contraband Phone also contained numerous screenshots of payments sent via Cash App and Zelle, in amounts ranging from $20 to $3,000, making it clear that the defendant was profiting from his drug trafficking.

The defendant also made several voice recordings in which he gave detailed instructions to co-conspirators to smuggle contraband into the MDC, the contents of some of which are detailed below:

a.  <u>Recording dated April 19, 2024</u> – "So, you see, what you, when you, when you first walk in the building, right?  There's a rec deck or whatever, there's a gate.  [N-word]s gonna throw a line out.  I just need you to tie the line to it.  I'll have my man come scoop you up around seven.  He gonna bring you down here and we'll get that situated."

b.  <u>Recording dated April 19, 2024</u> – "You know how, when you come inside the gate of the building, right when you come inside the gate, it's like a gate, it's above you.  We gonna throw the line out from that gate so you just run right in the gate and you hook it to the line cause there's a hook on the end of the line we got right now.  You just going to hook it and just dip back out.  Sturdy."

c.  <u>Recording dated April 19, 2024</u> – "Yeah, so I'ma tell y'all when to drive up.  We gonna have the line out already and I'ma just tell you drive right up, so you can get right out the car and do it.  She put the hook on the line?"

d.  <u>Recording dated April 25, 2024</u> – "Try to get the 50, the 50-foot rope with the hook, if not just get the 25-foot joint."

e.  <u>Recording dated April 28, 2024</u> – "[N-word]s can even use like the small sandwich bags and put about two ounces in it around in each one and tape it around the line or

---

[1]    "O" is a common slang term for an ounce, and "grabba" is a tobacco leaf product often used to wrap marijuana cigarettes.

[2]    "Bud" is a common slang term for marijuana.

[N-word]s could get uh, [N-word]s could get um, the big sandwich bags and put like three ounces, four ounces in it and spread it and then tape it onto the line."

f.  Recording dated April 28, 2024 – "Alright, hit me on Facetime just so I can show you the size right now, so I don't gotta baby you through the whole shit.  Cause if I can show you the size that we gonna have to get everything on the line, you'll know how to do it."

g.  Recording dated April 30, 2024 – "Yo, send me a picture of the line that you did and then a picture of the line that shorty did.  I don't know if we gonna, I wanna make sure that everything slides through that hole.  I don't wanna make no mistakes because this run that we do is gonna be a run that put me right back where I need to be to pay these white people off, and I'll be able to bust the moves that we really bust, because this is really like light money moves to us.  You smell me?  And I'll be right back where I need to be, where I'll be able to pay this Uber 20,000 every trip to come see me.  Cause I'm like, we need to really make this shit efficient, you know what I mean?  I wanna get like 30 nips on the line, but I wanna make sure everything that is on the front of the line is going to slide through first, cause the [N-word] was showing me his hand and showing me how he was pulling the line mad hard and the shit wasn't coming and shit because certain shit was stuck, because certain shit was too big for the hole, you smell me?"

h.  Recording dated May 12, 2024 – "Yo, you gonna grab this other little piece of line my son just did and just attach it at the bottom. You gotta do shit for [N-word]s like that in here or these [N-word]s will rat on you. I just told that [N-word] all right, so she just switched the destination to the Uber to Gates.  So you gonna grab that shit from Gates and then come straight here."

See ECF No. 1 at 6-7.

On June 30, 2024, the defendant's co-conspirators put his plan into action.  That day, Carl Kelly, with whom the defendant had repeatedly communicated on the Contraband Phone, arrived at the front of the MDC in a vehicle.  See Presentence Investigation Report ("PSR") ¶ 13.  Kelly pulled a long rope out of a tote bag and threw it towards the recreation deck directly above the MDC's main front entrance.  Id. ¶ 14.  The rope attached to an object protruding from the window of the fourth-floor recreation deck, which is adjacent to MDC housing unit G-43.  Id.

At the same time, video surveillance inside of the fourth-floor recreation deck captured Jonathan Guerrero, Ian Diez, Abel Mora, and Mayovanex Rodriguez as they attempted to pull the rope into the facility.  This video is attached hereto as Exhibit 1.  As shown in Exhibit 1, Guerrero, Diez, and Mora entered the recreation deck and stacked various items to form a tower from which Guerrero could access the windows at the top of the room.  See Exhibit 1 at 13:47:08-13:48:10.  Diez pushed a food cart into the recreation deck, and Mora carried a chair into the recreation deck, with Guerrero following immediately behind him.  Once inside, the three inmates stacked these items and pushed them to a corner of the room underneath a set of windows that faced out of the jail.  Id. at 13:48:30-50.  Guerrero then climbed up this tower of objects until he reached the windows, where he manipulated an object—the "line"—as Diez and Mora looked on.  Id. at 13:48:50-13:50:20.  For approximately nine minutes, Guerrero hung from

3

the window near the ceiling of the recreation deck, attempting to pull the "line" into the jail. During this time, Diez stood below him, spotting for him, and Mora served as a lookout. Id. at 13:50:20-13:59:30.  At approximately 2:00 p.m., Guerrero and Diez walked away from the window.  Id. at 14:00:05-30.  Then, at 2:02 p.m., Guerrero, Diez, and Mora all ran back to the window to try again.  Id. at 14:02:40-14:03:55.  This time, the "line" was visible on Exhibit 1 as Mora grabbed and pulled it.  Id. at 14:03:44.  Mayovanex Rodriguez then entered the recreation deck and climbed up to the window.  Id. at 14:04:30-14:06:11.  Rodriguez then fell to the ground, and all of the inmates ran out of the recreation deck.  Id. at 14:06:11-14:07:10.

Shortly thereafter, MDC staff recovered the rope that the co-defendants had been pulling on from inside of the MDC and found that it had been attached to the same rope that Kelly had thrown towards the fourth floor recreation deck.  Id. ¶ 16.  The rope was searched and found to consist of materials packed within duct tape, shaped in a rope-like manner.  The rope contained pieces of paper covered in MDMB-4en-PINACA, over 100 strips of buprenorphine, approximately 27 bags of marijuana, wrapping paper, over 400 cigarettes, two lighters, a scalpel, and a cell-phone charging cord and plug.  Id.  Photographs of the rope and its contents are shown below.



II.    Procedural History

On March 5, 2025, the defendant, Guerrero, Diez, Mora, and Rodriguez were charged by complaint with one count of conspiracy to possess contraband in prison, in violation of 18 U.S.C. § 371.  See ECF No. 1.  The defendant was arraigned on March 20, 2025.  See ECF

docket entry dated March 20, 2025. On March 25, 2025, the same defendants were charged by indictment with one count of possessing contraband in prison, in violation of 18 U.S.C. § 1791(a)(2), and one count of conspiracy, in violation of 18 U.S.C. § 371. See ECF No. 19. The defendant was also charged with one count of conspiracy to distribute a controlled substance. Id. On September 12, 2025, the defendant pled guilty before this Court pursuant to a plea agreement to Count Two of the indictment. See ECF No. 64.

Carl Kelly was charged by complaint with one count of conspiracy to provide contraband to a prison inmate, in violation of 18 U.S.C. § 371, on November 25, 2024. See United States v. Carl Kelly, 25-CR-250 (NGG), ECF No. 1. On September 9, 2025, Kelly pled guilty before this Court to an information charging the same count. Id., ECF No. 21. Kelly is scheduled to be sentenced on April 9, 2026. Id., Docket Entry dated February 19, 2026.

With respect to the defendant's other pending charges, on June 20, 2023, he was sentenced to 35 years' incarceration by the New York County Supreme Court following his conviction at trial of manslaughter in the first degree and other charges. See PSR ¶ 57. With respect to the charges pending in the Southern District of New York, on November 4, 2024, the defendant was sentenced to 115 months' incarceration to run concurrently with his state sentence. See PSR ¶ 56; see also United States v. Daryl Campbell, Docket No. 17-CR-112 (LGS) (S.D.N.Y.), Docket Entry dated Nov. 4, 2024.

III.     Legal Standard

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term

5

of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV.    Guidelines Calculation

The government agrees with the United States Probation Department's ("Probation") calculation of the defendant's offense level in the PSR as set forth below:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2P1.2(a)(2)) | 13 |
| Plus: Organizer or Leader (U.S.S.G. § 3B1.1(a)) | +4 |
| Minus: Acceptance of Responsibility (U.S.S.G. §§ 3E1.1(a), (b)) | -3 |
| Total Offense Level: | 14 |

See PSR ¶¶ 40-49.

Probation determined that the defendant falls into Criminal History Category VI. This differs from the estimate that the government included in the defendant's plea agreement, which assumed a Criminal History Category of IV. The reasons for this discrepancy are set forth below.

First, Probation assigned three points for the defendant's March 4, 2008 conviction for attempted criminal possession of a weapon in the third degree. See PSR ¶ 53. The government had not assigned any points for this conviction because the entry for this conviction in the criminal history report used by the government indicated that the defendant was sentenced to a prison term of one year; because this sentence was not imposed within ten years of the instant offense, it would not be counted. See U.S.S.G. § 4B1.1(e)(2). However, Probation obtained a certificate of disposition verifying that the defendant in fact received a sentence of 18 months, see PSR ¶ 53, so the government agrees with Probation that three points are appropriate for this conviction.

Second, the government erroneously assigned only three points for the defendant's June 20, 2023 trial conviction for manslaughter in the first degree and other crimes of violence. The government agrees with Probation that each of the three other crimes of violence for which the defendant was convicted at that trial should receive an additional point pursuant to U.S.S.G. § 4A1.1(d), and thus six points are assigned for this conviction. See PSR ¶ 57.

6

Third, Probation assigned three points for the defendant's June 15, 2017 conviction in the Southern District of New York for being a felon in possession of a firearm and receiving a firearm in interstate commerce. See PSR ¶ 56. This conviction and sentence were based on the same conduct as the defendant's June 20, 2023 conviction in New York County Supreme Court, namely, his fatal shooting at a Manhattan music venue. See PSR ¶¶ 56-57, United States v. Daryl Campbell, 17-CR-112 (LGS), ECF No. 128 (government's sentencing memorandum, explaining that the defendant is serving a 35-year sentence for "the same underlying criminal acts at issue here"). The government, after consulting with a Probation officer, had treated these two sentences as a single sentence because they were based on the same underlying conduct. If the defendant's prior sentence for felon-in-possession were treated as a single sentence with his sentence for manslaughter, it would only be assigned one point under U.S.S.G. § 4A1.1(d). Upon further review, the government agrees with Probation that the defendant's felon-in-possession sentence is, in fact, a separate sentence that is properly assigned three points. See United States v. Medina, 734 Fed. App'x 777, 779-80 (2d Cir. 2018).

Ultimately, the government agrees with Probation that the defendant falls within Criminal History Category VI and that the applicable range of imprisonment is 37 to 46 months. See PSR ¶¶ 60, 98. The government also agrees with Probation that, to the extent his criminal history score is based on points from state and federal sentences that arose from the same conduct and ran concurrently, the resulting criminal history score overrepresents his past criminal conduct, and the Court may take this into consideration at sentencing. See PSR ¶ 114.

V.    A Significant Consecutive Sentence Is Necessary to Deter the Defendant and Reflect the Seriousness of his Crimes

The government respectfully submits that a consecutive sentence of 33 months' imprisonment is necessary to reflect the seriousness of the defendant's conduct, promote respect for the law, and provide adequate deterrence to the defendant and to other federal inmates. See 18 U.S.C. § 3553(a)(1), (a)(2)(A), (a)(2)(B). At the time of the instant offense, the defendant was already serving a sentence of 35 years' imprisonment on New York County Supreme Court Ind. No. 2334-2017. See PSR ¶ 57. Therefore, the Court should impose any custodial sentence in this case consecutively to the defendant's undischarged terms of imprisonment. See PSR ¶ 99.[3]

The nature and circumstances of the instant offense are serious and deserving of a significant sentence. As the Court is aware, the possession of contraband at the MDC poses a grave security concern for both inmates and correctional officers. The items that the defendant conspired to smuggle into the MDC would have caused danger and disorder in nearly every way imaginable. Inmates have used small, easily concealed weapons like the scalpel shown above to

---

[3]    If the defendant were convicted of the substantive crime of possessing contraband in prison, a consecutive sentence would be mandated by 18 U.S.C. § 1791(c). Because the defendant was convicted of conspiracy under 18 U.S.C. § 371, a consecutive sentence is not mandatory. However, a consecutive sentence is permissible under 18 U.S.C. § 3584(a), recommended by the Guidelines (see U.S.S.G. § 5G1.3(a)), and warranted in this case for the reasons set forth below.

commit slashings, stabbings, and even murders inside of the MDC.  See, e.g., U.S. DEP'T OF JUSTICE, Federal Charges Announced Against Inmates for Violent Crimes Committed in the Metropolitan Detention Center in Brooklyn (September 30, 2024), https://www.justice.gov/usao-edny/pr/federal-charges-announced-against-inmates-violent-crimes-committed-metropolitan (describing a series of stabbings and murders committed at the MDC from April to August 2024).  The controlled substances, cigarettes, and marijuana found in the rope would have fueled the illicit prison economy, which itself often leads to violence among inmates; and the contraband lighters present an obvious fire safety hazard.  MDMB-4en-PINACA, in particular, was added as a Schedule I controlled substance in 2023 because the Drug Enforcement Administration ("DEA") recognized it as especially dangerous and subject to abuse.  As described in the DEA's notice of intent to add MDMB-4en-PINACA to Schedule I, the abuse of MDMB-4en-PINACA for its psychotropic properties has been increasingly prevalent; it has no accepted medical use; and emergency room presentations involving MDMB-4en-PINACA have included seizures, sudden collapse, involuntary muscle spasms, catatonia, and increased violence.  See Federal Register Vol. 88, No. 64, 19896-19901 (Apr. 4, 2023).

In short, if the defendant had succeeded in his efforts to introduce this panoply of contraband into the MDC, it would have unquestionably wreaked havoc on the safety of MDC inmates and correctional officers and further strained the resources of the Bureau of Prisons.  The Court's sentence should reflect both the seriousness of this offense and the importance of maintaining the safety and security of the MDC.

The need for deterrence and promotion of respect for the law is especially strong in the case of a defendant such as Campbell.  The defendant was incarcerated at the MDC in the first place because he shot a man at close range in the chest, killing him.  See PSR ¶ 56.  The defendant, already a felon with a prior firearm conviction, had opened fire inside of a crowded Manhattan concert venue, shooting a rival rapper in the legs, killing the rapper's bodyguard, and seriously injuring two innocent bystanders; one bystander, who was shot in the stomach, had 15 inches of his intestines surgically removed.  Id.  For these crimes, the defendant was convicted of manslaughter in the first degree and related crimes in New York County Supreme Court and of being a felon in possession of a firearm in the Southern District of New York.  Id. ¶¶ 56, 57.

While incarcerated for the latter case, the defendant has repeatedly possessed contraband cell phones, which he used in his scheme to smuggle contraband.  Besides the Contraband Phone used in the instant offense, contraband cell phones were also found in his possession in February 2024 and July 2024.  See PSR ¶ 56.  In addition, although the June 30, 2024 smuggling attempt failed, it is clear that he had successfully introduced contraband on other occasions: the recordings on the Contraband Phone showed that he was offering marijuana and "grabba" for sale, and marijuana was found in the defendant's cell in November 2024.  See PSR ¶ 60.  Moreover, while incarcerated, the defendant has continued to post to the same Twitter/X account that was found on the Contraband Phone, including a post as recently as last Wednesday, shown below:

**DADITO CALDERONE** ✓
@TAXSTONE

Martin Luther King day made 9years I've been down. Have you've progressed in the last 9 years ? I hope so cause the government has me like a statue so if you're a statue too that's just something you agree with being .

6:32 PM · Mar 4, 2026 · **3,419** Views

💬 1          🔁 3          ♡ 37          🔖 2          ↥

The defendant appears to place the blame for his misconduct with the very prison system whose rules he has flouted and whose resources he has strained. See Defendant's Sentencing Memorandum ("Def. Sent. Mem.") at 1. But the defendant was only at the MDC in the first place because of his own act of extreme violence, killing one man and seriously injuring multiple innocent bystanders at a crowded concert venue. While the defendant makes blanket generalizations about dysfunction at "[f]ederal jails, state jails, and juvenile jails" (Def. Sent. Mem. at 1), the prison that he was actually in at the time of the instant offense has made enormous progress in increasing and stabilizing staffing levels and reducing contraband smuggling by inmates like the defendant. See, e.g., United States v. Burgos, 24 Cr. 650 (LTS) (S.D.N.Y. May 21, 2025) (Tr. of Sentencing Hr'g 44: "[T]he conditions at the MDC detention facility have improved, including because staffing there has been increased."). More fundamentally, the defendant should not be rewarded for the very prison conditions that he himself has helped to bring about. Lockdowns and staffing issues at the MDC derive, at least in part, from smuggling and drug trafficking by inmates like the defendant, who force the BOP to divert resources and interrupt day-to-day operations to try to stem the flow of contraband. Therefore, the defendant should face harsher punishment as one of the inmates who has contributed to lockdowns and disorder at the MDC by trafficking in drugs and other contraband.

The defendant also claims to have renounced gang life and encouraged young men to avoid gang activity. See Def. Sent. Mem. at 10. But his actions in this case show that he has continued to recruit others into organized criminal activity, to their detriment. He instructed co-conspirators on how to package contraband, to deliver it to the MDC, and to get it into the jail, providing advice and guidance along the way as to how to accomplish each step in the process. His scheme resulted in the convictions of five other defendants, all younger than him. Thus, far from helping "young men . . . pivot to a better life," Def. Sent. Mem. at 10, the defendant has driven at least five other, younger men further into a life of crime.

There is no question that Campbell, as the organizer of the scheme, is the most culpable of the defendants charged in the Indictment, and he should therefore receive the harshest sentence. His co-defendants, whose conduct was limited to attempting to pull a rope containing contraband into the MDC on June 30, 2024, received sentences between 6 months' and 30 months' imprisonment. See, e.g., ECF Nos. 97, 102. In contrast, the defendant orchestrated a monthslong smuggling scheme, explained the "line" method to others, gave detailed instructions to co-conspirators outside of the MDC, sold marijuana and other substances while incarcerated, and appears to have profited from his illicit trade in contraband. A sentence

of 33 months' imprisonment is necessary to punish the defendant and demonstrate to him and any other inmate who would spend their time at the MDC trying to smuggle contraband drugs and weapons that their actions will not be tolerated.

VI.   Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 33 months' imprisonment, consecutive to the federal and state sentences he is already serving.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:   _____
Russell Noble
Assistant U.S. Attorney
(718) 254-6178

cc:   Counsel of Record (by ECF)
Frank Thomas Nikolaidis, U.S. Probation Officer (by email)

10